UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

APR 10 2013

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| Michael (Mikhail) Tyurin | § | |
| P.O. BOX 300819; HOUSTON, TX 77230 | § | |
| Versus | § | CIVIL ACTION NO._____ |
| | § | |
| Dartmouth College | § | |
| 63 S Main St, Ste 301 | § | **13 CV 1025** |
| Hanover NH 03755 | § | |

ORIGINAL COMPLAINT

1.  <u>This is a diversity case</u> comprising torts and discrimination against the Plaintiff, committed by Dartmouth College, with three counts of federal fraud: two - to get access to taxpayer's money in the form of federal grants by making fraudulent statements in the SBIR I and II grant applications, and the other one was the fraudulent statement based on stolen name and identity of the Plaintiff to avoid filing the SF-425 on likely improper spending of federal grant funds (DE-FG02-03ER83593).

The case comprises:

• Appropriation of the Plaintiff's personal Electrotransformation Generator, and related pre-existing IP for commercial use by Dartmouth College;

• Exposure to beta-radioactive compound $^{14}$C without the Plaintiff's knowledge at Dartmouth College lab;

• Bad professional references, misuse of the Plaintiff's name, libel and no proper credits for the Plaintiff's achievements during the Plaintiff's work at Dartmouth College;

• Incorrect employment records Dartmouth College have been rendering since the Plaintiff's resignation in 2006;

• The Plaintiff's identity was stolen by the Plaintiff's former employers, full-time employees of Dartmouth College during the Plaintiff's work at Dartmouth College.

As the TX business owner the Plaintiff experiences the on-going damages resulting from the above and affecting the Plaintiff's business revenue stream. The total amount of damages the Plaintiff is seeking is $15,000,000.00 with no interest included. The Plaintiff respectfully requests Jury Trial.

The Plaintiff is:

Michael (Mikhail) Tyurin, M.D., Ph.D.

P.O. Box 300819

Houston, TX 77230

2294168994

The Defendant is:

Dartmouth College

14 S Main St Ste 2-C

Hanover NH 03755

Registrant (2012):

Dartmouth College

C/O Robert Donin, General Counsel

63 South Main St., Ste 301

Hanover, NH 03755

2. The Court jurisdiction statement

- Dartmouth College has a substantial presence in the State of Texas as a recipient of multiple federal grants paid by taxpayer's money;

- Dartmouth College runs health care- and health research-associated programs for which it hires and employs personnel in the State of Texas: http://www.flipdog.com/jobs/texas/dartmouth-college-recruitment-center/

- Dartmouth College has health care-related projects already performed and in progress in the State of Texas: "TRUSTEES OF DARTMOUTH COLLEGE

  Project Title: "Engaging patients through shared decision making:  using patient and family activators to meet the triple aim"

  Geographic Reach: California, Colorado, Idaho, Iowa, Maine, Massachusetts, Michigan, Minnesota, New Hampshire, New Jersey, New York, Oregon, **Texas**, Utah, Vermont, Washington

  Funding Amount: $26,172,439

  Estimated 3-Year Savings: $63,798,577

Summary: The Trustees of Dartmouth College is receiving an award to collaborate with 15 large health care systems around the country to hire Patient and Family Activators (PFAs). The PFAs will be trained to engage in shared decision making with patients and their families, focusing on preferences and supplying sensitive care choices. PFAs may work with patients at a single decision point or over multiple visits for those with chronic conditions. It is anticipated that this intervention will lead to a reduction in utilization and costs and provide invaluable data on patient engagement processes and effective decision making—leading to new outcomes measures for patient and family engagement in shared decision making. Over a three-year period, the Trustees of Dartmouth College-sponsored program will train 5,775 health care workers and create 48 positions for patient and family activators."

As found at: http://www.healthcareitnews.com/news/dartmouth-board-garners-26m-innovation-grant;

http://innovations.cms.gov/initiatives/Innovation-Awards/california.html.


3.  Intentional torts committed against the Plaintiff, the Plaintiff's property, the Plaintiff's health, the Plaintiff's professional and social image, and the Plaintiff's well-being by Dartmouth College (group Lynd/Mielenz/Hogsett in conspiracy with Thayer School of Engineering Dean's Office and Dartmouth HR), comprising also national origin- and age-based discrimination against the Plaintiff

**Glossary**:

[1]Electrotransformation generator (EG) – sophisticated capital equipment capable of performing electrotransformation using precisely controlled high voltage electric pulses.


[2]Electrotransformation – electric pulse-powered delivery of polar molecules into target cells via created *de novo* by the same electric pulse micropores in cell membrane with subsequent sealing of the pores and expression of introduced nucleic acids used, in particular, for metabolic engineering.


[3]Consolidated Bioprocessing (CBP) is a "low-cost" cellulose simultaneous hydrolysis and fermentation technology using genetically modified bacteria (*C. thermocellum* and other CBP bacteria) and yeast to convert cellulosic biomass into high-value end-products in a single step that combines hydrolysis and fermentation.

[4]The Small Business Innovation Research (or SBIR) is commercial Federal grant stimulation program designed for for-profit small (< 50 ppl) companies and includes SBIR Phase I ("proof of concept") (6 months and $\leq$$100,000.00) and SBIR Phase II (48 months and $\leq$$750,000.00) prototype development and testing for subsequent venture capitalist -assisted commercialization.

The Plaintiff would like to emphasize two important details relevant to the subject matter of the Plaintiff's diversity claim:

1) The Plaintiff's name is spelled in English as "Michael (Mikhail) Tyurin". There are only two people with the same name spelling at www.google.com: myself and Russian Cosmonaut Mikhail V. Tyurin. Therefore, the Plaintiff's name is rare in the US.

2) The Plaintiff is the inventor, the owner and now the distributor of the Plaintiff's proprietary [1]EG, originally invented, patented and manufactured in the USSR in 1992 (Russian patent 2005776 http://www.syngasbiofuelsenergy.com/Patents/RUpatent2005776.pdf).

The generator is a high-end piece of solid state electronics with essential circuit elements available only from the Plaintiff's country of origin. The Plaintiff has a functional copy of the EG in the US since 1998. The Plaintiff has done a lot of research using his EG. The EG renders unmet elsewhere experimental conditions making any genetic/metabolic engineering project always successful at minimal possible time and cost:

http://www.ncbi.nlm.nih.gov/pubmed/23519429

http://www.ncbi.nlm.nih.gov/pubmed/23292245

http://www.ncbi.nlm.nih.gov/pubmed/23289641

http://www.ncbi.nlm.nih.gov/pubmed/23277387

http://www.ncbi.nlm.nih.gov/pubmed/22941272

http://www.ncbi.nlm.nih.gov/pubmed/22642684

http://www.ncbi.nlm.nih.gov/pubmed/22549584

http://www.ncbi.nlm.nih.gov/pubmed/16332787

http://www.ncbi.nlm.nih.gov/pubmed/14766568

http://www.ncbi.nlm.nih.gov/pubmed/10735989

http://www.ncbi.nlm.nih.gov/pubmed/9257287

http://www.ncbi.nlm.nih.gov/pubmed/9785348

http://www.ncbi.nlm.nih.gov/pubmed/9702727

http://www.ncbi.nlm.nih.gov/pubmed/1417333

Statements of the Claims

I.    *Appropriation of* the Plaintiff's *personal EG, related pre-existing IP and* the Plaintiff's *name for commercial use at Thayer School of Engineering, Dartmouth College*

In 2001, the Plaintiff received an invitation from Associate Professor Lee Lynd, Thayer School of Engineering, Dartmouth College, to join his team as a Visiting Research Professor.

Upon joining Dartmouth College on January 02, 2002, the Plaintiff requested a letter from Thayer School Dean Duncan stating that the Plaintiff could bring his EG to his work place and take it back at any time, with the Plaintiff's EG use only for non-commercial research. Dean Duncan provided the Plaintiff with such letter (copy to Lynd) on or about January 20, 2002. For the record: *Since early 2003, the Plaintiff did not see the letter in his personal papers he stored at his desk in Rm. 102 at Thayer School of Engineering. Apparently someone took it when the Plaintiff was not there.* The Plaintiff requested the copies of the above letter and SBIR I & II files (FY 2003-2005) from the Thayer School Dean's Office on 09/10/2012 and 03/23/2013, and got only Email from the legal counselor advising to supply the copies of the documents requesting from the Dean [Exhibit 1]. *Thayer School Dean Heble repetitively discriminated against my right for the information based on the Plaintiff's nationality as related to the appropriation of the Plaintiff's EG and pre-existing IP by Dartmouth College.*

Soon after the Plaintiff's start and with the use of his EG, the Plaintiff made tremendous progress which Lynd had missed for nearly a decade [Exhibits 2 and 3]. The Plaintiff reached [2]ET efficiencies of *Clostridium thermocellum* and *Thermoanaerobacterium saccharlyticum* suitable for time- and cost-efficient metabolic engineering as related to [3]CBP for commercial fuel ethanol technology.  To write the AEM article [Exhibit 3], The Plaintiff generated data using his EG along with funds from grants 60NANB1D0064 (NIST) and DEFG02-02ER1530 (DOE) not associated with commercial applications. During proofreading in or about October 2003, *Lynd has ordered the Plaintiff to add DOE grant DE-FG02-03ER83593* to the Acknowledgement section of the AEM manuscript [Exhibit 3]. The Plaintiff was not aware of that grant existence when accumulated the data in 2002-first half of 2003. Therefore, the Plaintiff did not realize that listing of DE-FG02-03ER83593 as the source of financial support for his AEM article

[Exhibit 3] was in fact the *appropriation of his EG by Dartmouth College (Lynd/Mielenz, Thayer School of Engineering) for commercial use*.

Mielenz joined Dartmouth College full-time (June 2002 - July 2005). The DOE records the Plaintiff got under FIA in 2013, stated that Mielenz had organized Advanced Bioconversion Technologies, LLC (ABT LLC) at Thayer School of Engineering, Dartmouth College as "a limited partnership between Jonathan Mielenz and Dartmouth faculty members Charles Wyman and Lee Lynd" [Exhibit 4] to apply for DOE [4]SBIR Grant for FY 2003-2005. For SBIR I application Mielenz, in conspiracy with Lynd, and with no the Plaintiff's knowledge/consent, used the Plaintiff's materials generated and prepared for submission to AEM in 09/2003 [Exhibit 3] *thus committing Federal fraud* when he claimed in his SBIR I Grant application *his unlimited access to the Plaintiff's EG as the critical and essential part of success during the proof of concept stage (SBIR I FY2003) to receive SBIR II award for prototype development and testing in FY 2004-2005* [Exhibit 4]. In or about July 2003 Lynd and Mielenz told the Plaintiff that ABT LLC had received the SBIR I award for the FY 2003. Mielenz then applied and received the SBIR II award (FY 2004-2005) [Exhibit 4].

Real ABT LLC formation/registration date (in late 2002 - early 2003(?)) is in shadows: ABT LLC registration date 12/08/2013 [Exhibit 5] contradicts to existing SBIR I (federal) record [Exhibit 6], where ABT LLC is listed as the recipient of SBIR I award for FY 2003 before the business was actually registered. In [Exhibit 4], Mielenz noted Thayer School Dean Duncan granted support for ABT LLC's unlimited access to the facilities and equipment of Thayer School of Engineering, Dartmouth College, which implied *Thayer School of Engineering claimed the Plaintiff's EG as the School property* [Exhibit 7]. The result of the Plaintiff's EG use were 1) near complete elimination of acetate production by *C. themrocellum* alone with 2) complete elimination of acetate and lactate in *Thermoanaerobacterium scaccharolyticum* [Exhibits 4, 8 and 9] to redirect sugar carbon flow to fuel ethanol to became the corner stone of the metabolic engineering IP under the federal grant funding to ABT LLC. The same IP was used to raise $30M venture capital for Mascoma Corporation which acquired ABT Inc. (product of ABT LLC conversion) in November 2006 [Exhibit 9] (Fig. 1). Mascoma Corporation was founded by Johnsen and Dartmouth Professors Wyman, Lynd with initial funding from Khosla Ventures and Flagship Ventures (http://www.mascoma.com/sub_business07.php).

Fig. 1 shows commercial activities of ABT LLC/Inc/Mascoma Corporation operated at Thayer School of Engineering in 2002-2006, combined with the dates of the Plaintiff's employment at Dartmouth College and related

to the intentional torts committed against the Plaintiff by the group Lynd/Wyman/Mielenz/Hogsett, full-time

Dartmouth employees, at the facilities of Thayer School of Engineering, Dartmouth College, with conspiracy with

Thayer School Dean office and Dartmouth HR, which included but was not limited to *appropriation of the*

*Plaintiff's EG and pre-existing IP for commercial use against the Plaintiff's explicitly expressed will.*



Fig.1. Blue horizontal line: Scheme used by the group of Lynd/Wyman/Mielenz/Hogsett at Thayer School of Engineering, Dartmouth College for revenue generation in 2002-2006: 1) Generation of IP and technology under 60NANB1D0064 (NIST), DEFG02-02ER1530 (DOE) for receiving DOE DE-FG02-03ER83593 SBIR I ($99,864.00) and SBIR II ($749,827.00) (Lynd/Mielenz) [Exhibit 6]. 2. Transition of ABT LLC to ABT Inc, a DE Corporation operating in NH (Lynd/Hogsett) [Exhibit 33] (in fact appropriation of the IP and data developed with the use of the Plaintiff's EG and taxpayers money as SBIR grant support [Exhibit 6]). 3. Acquisition of ABT Inc. by Mascoma Corporation in November 2006 for $30M venture capital funding [Exhibit 9] (Lynd/Wyman). DOE was not aware of the step 3 until 2012 when the Plaintiff requested the ABT LLC DOE SBIR I and II materials from DOE under the FIA [Exhibit 4]. DOE continued Emailing Mielenz and the Plaintiff through 2012 asking if Mielenz had commercialized the technology developed at ABT LLC under DE-FG02-03ER83593 [Exhibits 5, 10]. Green horizontal line – the Plaintiff's work at Dartmouth College in 2002-2006: major events associated with intentional torts against the Plaintiff (brown ovals) committed by Dartmouth College. Shown torts do not include the outstanding torts presently affecting revenue stream for the Plaintiff's TX business.

Only in 2012 the Plaintiff realized, *that full-time Dartmouth employees Lynd, Mielenz and Hogsett have*

*established conspiracy to appropriate his IP and his EG to get federal funding [Exhibit 6] for ABT, LLC via making*

*fraudulent statements in their SBIR I and II grant applications to generate revenue from the granted funds over the*

*of conversion of ABT LLC to ABT Inc, and then acquisition of ABT Inc by Mascoma Corporation [Exhibit 9].* In or

about July 2003 Lynd and Mielenz told the Plaintiff that ABT LLC had received DOE SBIR I FY 2003 Award:

Lynd told the Plaintiff that Lynd's NIST grant funds were not sufficient to support the Plaintiff and asked to join

ABT, LLC as the PI and Senior Scientist: Dartmouth College ~40 % with no benefits, and ~60 % at ABT, LLC with

taxable benefits allowance. *The Plaintiff never got any paperwork justifying change of his employment status at Dartmouth College in 2003 neither from the College nor from ABT LLC, which appears fluctuating in the Dartmouth HR Record they release to a third party* [Exhibit 11]. *On May 06, 2004, Lynd, Mielenz and Sullivan at Thayer School patented the Plaintiff's EG pretending, that hid EG was developed at Thayer School during his term there (federal fraud II), and forced the Plaintiff to sign the patent application making him the co-author of his pre-existing EG and related IP [Exhibit 12]* which were only the Plaintiff's prior to that (http://www.syngasbiofuelsenergy.com/Patents/RUpatent2005776.pdf). *The Plaintiff was coerced to sign* and signed the patent application under pressure with notarized reservations [Exhibit 12] which had prompted Lynd to delay submission of the Plaintiff's next manuscript to AEM by 6 months [Exhibit 13] until patent application was filed. The Plaintiff's *customers these days ask him if his EG actually had originated from Dartmouth [Exhibit 14], which affects revenue stream for the Plaintiff's business.*

In July 2004 the Plaintiff's *got the only ABT LLC paperwork offering him a part-time Senior Scientist and PI position* [Exhibit 15]. *In August 2004 the Plaintiff did not receive his regular ABT LLC paycheck I was getting from 2003.* Early in September 2004 the Plaintiff Emailed ABT LLC owners Lynd and Mielenz asking his ABT LLC check and repeating again after 2002 that the Plaintiff was against the commercial use of his EG [Exhibit 16]. *Lynd "responded" on or about September 13, 2004 – the Plaintiff's new Volvo S60 was brutally vandalized at always crowded Dartmouth Parking lot near Collins Hall during my regular business hours with no witnesses according to Hanover PD and Dartmouth Security. Lynd was laughing at* the Plaintiff *the next morning when the Plaintiff told him how I did feel about my new car (nationality-based discrimination).*

*The torts, associated with appropriation of the Plaintiff's EG, age- and nationality-based wage discrimination and alleged exposure to radioactive materials at work* made him hire an employment attorney Olcott in April 2005. Olcott sent a letter to Thayer School Interim Dean Lotko [Exhibit 17]. As a result, the Plaintiff was able to recover some under-paid by ABT LLC wages for healthcare allowance with still $600.00 not paid by Hogsett in 2006 which he put in his pocket. Hogsett was Dartmouth full-time employee and the ABTLLC/Inc. President in 2005-2006 after Mielenz left. In "response" to Olcott letter [Exhibit 17], Lynd hired Dartmouth undergraduate *Olson* to get the exact understanding of the Plaintiff's EG circuit. *Olson burned the Plaintiff's EG by applying unknown high voltage signal (the source of external high frequency was actually malfunctioning) at frequency ~ 24 MHz to its internal circuit and ruined my EG with total damages of $25,000 only in parts* (equivalent to the Dartmouth portion of the

Plaintiff's annual wage before taxes), not available in the US.  The partial refund, the amount of ~ $3,500 was however paid by Dartmouth College (Lynd) directly to the Plaintiff's father who purchased and brought with him from Russia the damaged tetrode when visited the Plaintiff's in 2005.  *The outstanding effect of the 2004 patent application with extra "co-authors" Lynd and Sullivan causes the revenue losses for the Plaintiff's TX businesses: with the annual market demand 1 copy of his EG ($187,000.00) the total damage since 2004 exceeds $1,683,000.00 with no interest included*.

The Plaintiff is claiming *intentional tort done to him by Dartmouth College Employees Lynd/Mielenz/Hogsett in conspiracy with Dartmouth officials via appropriation of his EG and pre-existing IP resulting in the amount of damages to the Plaintiff equivalent to $6M portion of the revenue Mascoma Corporation generated with help of venture capitalists during acquisition of ABT Inc (former ABT LLC).  The Plaintiff is claiming the amount of damages equivalent to the cost of the metabolic engineering IP part developed with the use of his EG and his pre-existing IP at Dartmouth College in 2002-2005.* The $6M does not include any taxpayer's money from the DOE SBIR I and II grant DE-FG02-03ER83593 to ABT LLC.

*Total damages from the above torts are $7,683,000.00 with no interest included since 2006*.

II.   *Exposure to beta radioactive chemical $^{14}C$ in anaerobic chamber without the Plaintiff's knowledge:*

The Plaintiff's case is simple. Lynd's Ph.D.-Student Yiheng Zhang, with no good laboratory safety skills and practices and poor English, was gathering crucial academic proof Lynd needed for his [3)]CBP theory to testify before the US Senate to define, defend and protect his fatherhood of cellulosic ethanol and CBP approach aimed at adding to our tax burden, increase of food and gasoline costs and funding of all biomass-related science.  Zhang obtained the data [Exhibit 19] prior to 2005 when he left the School. The Plaintiff's became aware of the intensive work with $^{14}C$ only in 2005 from [Exhibit 19] when started recollecting the circumstances under which he could have developed progressing symptoms of his Hypophysys damage.

Isotope $^{14}C$ (half-life decay time ~ 5,800 years) emits beta-particles. Beta particles travel meters in air and up to 8-14 millimeters in tissues. Beta particles are tortuous: they collide with tissue orbital electrons causing their ejections from atoms. Such secondary electrons are known as *delta rays* [Exhibit 18]. Exposure may be detected via testing urine samples collected on the day of exposure. $^{14}C$-exposure happens without knowing that if no good laboratory practices are enforced and will be discovered as health complications years later.



anaerobic
chamber
plastic bag

Fig.2. Double size Coy anaerobic chamber for work with strict anaerobes (http://www.coylab.com/custom-lg.htm)

In *2002 – 2005 Zhang and the Plaintiff shared the same anaerobic chamber* looking like the one in Fig. 2. In the Plaintiff's recollection, Zhang often placed large (0.5 – 1 L) bottles with media/solutions in the chamber to split the liquid content under anoxic conditions into small vials /serum bottles under rubber stoppers using disposable syringes or using syringes/micropipets and sealing the bottles. The Plaintiff witnessed *multiple unidentified liquid spills in the anaerobic chamber over the time Zhang worked in the lab*, each of them reported to Lynd /Mielenz/Hogsett over 2002-2006. The Plaintiff never got feedbacks on how safe were the spilled materials. In response to the Plaintiff's inquiry of the $^{14}C$ contamination Hogsett acting as Lynd's lab Manager at Thayer School of Engineering in addition to his Presidency at ABT LLC/Inc, Emailed about radioactive decontamination in the lab [Exhibit 20]. The Email [Exhibit 20] *intentionally missed the OSHA officer email address and outlined only fraction of the areas contaminated by $^{14}C$ not including the anaerobic chamber – the Plaintiff's major safety concern presently.* Lynd responded [Exhibit 21] to Attorney Olcott letter [Exhibit 17] where she raised the Plaintiff's $^{14}C$ contamination concern, indicating that Lyndhad resolved the radioactive exposure issue. No action has been taken to decontaminate anaerobic chambers since no one was actually informed about this lab area contaminated with $^{14}C$. Lynd's record of poor lab safety management included Ph.D.- student Zhiliang Fun. While alone in the lab on Friday night, Zhiliang had severely burned her chest and abdomen area with boiling 40 % glucose solution when a 3 gallon bottle she filled to the stopper prior to autoclaving, exploded when Zhiliang pulled it out of the hot autoclave.

*No radioactivity sign was on anaerobic chambers in 2002-2006 in Lynd's lab.* Only recently, after noticing progressing decline of my health, the Plaintiff put together [Exhibit 19] and multiple un-identified spills in anaerobic chamber in 2002 – 2005 to finally figure out that "the Plaintiff's" anaerobic chamber had been used for work with $^{14}C$ without notifying OSHA and the Plaintiff as the major user. Early in 2006 the Plaintiff has reported multiple

incidents of cross-contamination in anaerobic chambers due to unsafe bio-contamination levels. The Plaintiff explicitly states that _Lynd and Hogsett specifically asked him just after the Plaintiff submitted his resignation letter, to render his expert help in replacing the plastic bag_ (Fig. 2) _on the anaerobic chamber in addition to not notifying all the chamber users of the radioactive work in it in 2002-2006_ thus committed _tort against the Plaintiff causing his health damage from his exposure to $^{14}C$ at Dartmouth College_. The Plaintiff helped Lynd and Hogsett by replacing the old bag with a new one _in August 2006_. That part of the Plaintiff's job at Dartmouth College _was in addition to the regular exposure to dust in the lab containing $^{14}C$. The additional $^{14}C$ exposure included entering the chamber to get all bio-contaminated equipment out, clean that equipment and tools from biological contamination, wipe each surface multiple times after cleaning, dispose garbage, cleaning tissue, paper towels, liquids etc. used for cleaning and the old plastic bag weighing ~ 50 lbs, then paint the surfaces of the equipment with sterile clear polyurethane and re-assemble the chamber back._ The job took the Plaintiff ~two weeks, at ~9 hours of daily work load, while _the Plaintiff was inhaling all the dust and particles accumulated in the chamber including those heavily contaminated with $^{14}C$ as the Plaintiff is learning now from recent changes in his health. The Plaintiff_ will testify under Oath that the only place he had ever been in contact with radioactive materials was his work at Dartmouth College in Lynd's lab in 2002-2006, and that _Lynd conspired with HR to generate inaccurate record that the Plaintiff was not Dartmouth employee at the time he worked on the replacing the chamber plastic bag_ [ Exhibit 11 ] – intentional tort against the Plaintiff and his well-being.

Hypophysis is the closest brain target for dust contaminated with $^{14}C$: it is just <10 mm away from the walls of upper nasal cavities where dust depositions with $^{14}C$ happen. Now the Plaintiff does have health consequences outlined below, which made him recollect meticulously his working past above, since he got progressively sick.

_Exposure to $^{14}C$ through inhaling at the Plaintiff's workplace at Thayer School of Engineering had caused sudden irreversible decline in his heath becoming more obvious and aggravated with time. The symptoms of Hypophysis function loss appeared suddenly with rapid onset in February of 2011: accelerated aging (multiple face wrinkles and loss of skin turgor everywhere), loss of global cell sensitivity to insulin (sudden diabetes II), muscle mass and tonus loss (ca 60 lbs of muscle tissue, two clothing sizes from 4X to 2X (Picture ID 2008, and in 2011[Exhibit 22]), >one and a half inch in body height from 5'11" to <5'9½" and one inch in wrist width: 8" prior to 2011 to 7"), loss of thyroid function, loss of testosterone production, para-thyroid hypo function, loss of mineral corticoid function - Buddha type fat deposition around belle, sudden spikes in blood pressure not relieved with regular intake_

*of prescribed combination HCTZ 50 mg, lisinopril 30 mg and bisoprolol 20 mg, morning hypertension 170/120 mm Hg, severe arthritis, compromised immunity, inability to sleep more than 5 hours as the blood pressure spikes and pain spreads all over the body.*

*The damage Dartmouth College had caused to the Plaintiff leads to premature death after full-time disability develops with no proper expensive treatment.  The Plaintiff is requesting a life-time health insurance from Dartmouth College (~ $3M) to cover each and every expense the Plaintiff incurs as related to the loss of his Hypophysis function and related complications as outlined above and will be diagnosed later in addition to extra expenses for any related brain tumor surgeries/ stem cell transplantations and expensive hospital treatment as related to the main health problem caused by the Plaintiff's $^{14}$C exposure at Thayer School of Engineering, Dartmouth College.*

III.    *Bad professional references, misuse of the Plaintiff's name, libel and no proper credits for the Plaintiff's achievements from Lynd/Hogsett and Gerngross:*

The Plaintiff's job market value of M.D. and Ph.D. with 16 years (at that time) of postdoctoral biotechnology industry experience and also in overseas Academia at the Associate Professor level with active publication/patents record was ~150k base in NH.  The Plaintiff started search of a position with more appropriate pay in 2003. The search lasted until July 2006 with no definite success despite of the Plaintiff's tremendous background and achievements [Exhibit 23]. In March 2005 the Plaintiff collected the evidence what Lynd badmouthed him [Exhibit 24] as his professional reference after in 2003 the Plaintiff got Lynd's permission to use his name.  Lynd was very upset that the Plaintiff wanted to leave in the middle of the commercial DOE ABT project without rendering Lynd a copy of the Plaintiff's generator [Exhibits 16, 24]. *After learning that the Plaintiff had excluded Lynd from the list of his professional references in March of 2005. Then Lynd arranged that Dartmouth College HR renders incorrect employment information despite the job position letters The College rendered to the Plaintiff – conspiracy, tort, nationality-based discrimination with damages.*

There is *a conspiracy at Dartmouth College to destroy the Plaintiff's well-being, professional and social image thus leading to the Plaintiff's long time inability to land a full-time executive level position elsewhere and therefore prevent him from getting proper health insurance coverage which would enable mitigating the developed symptoms of Hypophysis damage by $^{14}$C so well elaborated by Lynd/ Mielenz /Hogsett.*

*Lynd continued slandering the Plaintiff's name and the Plaintiff's contribution to Lynd's projects by creating another libel* the Plaintiff got from the Patent Office of Michigan State University in February 2007: the MSU Patent Office asked the Plaintiff's signature on the statement that *the Plaintiff merely did anything in Lynd's lab, was not independent in project design and execution, etc.* in response the their request to remove the Plaintiff's name from one of Lynd's patent applications filed with no the Plaintiff's knowledge and consent [Exhibit 25].

*Lynd ruined the Plaintiff's established in 1984 scientific image and reputation of the top-notch microbiologist, molecular biologist/geneticist and metabolic engineer by his patenting activities listing the Plaintiff name after the Plaintiff left*. *There are > seven patent applications filed all over the world the Plaintiff was not aware about,* where the Plaintiff was the co-author of the "mutants" obtained using recombinant DNA technology. The Plaintiff signed a couple of similar applications in 2008 with no word "mutant" in the claims /abstract yet at that time, after *Lynd made the patent law firm hire private investigator to find the Plaintiff in GA (invasion of privacy)*. Dartmouth patent applications [Exhibit 8] created life-long damage to the Plaintiff's professional reputation of the top-notch biotechnology executive around the world by claiming the Plaintiff a co-author of the "mutants" where there were actually recombinants.

In 2004-2005, the Plaintiff helped Gerngross (Thayer School of Engineering) to develop electrotransformation of *Ralstonia eutropha*, organism with ~$15 billion market potential. For Gerngross group, the Plaintiff invented efficient electrotranfromation of *Ralstonia eutropha* H16 using his electroporation generator and also elaborated experimental conditions for commercial electrotransformation equipment in 2005. Gerngross's associate Jesse McCool validated the Plaintiff's results. *After the Plaintiff asked Gerngross, Gerngross refused to offer the Plaintiff his reference or credit for what the Plaintiff did for his team.*

Hogsett spoke with CEO of Genomatica, Inc. Christophe Shilling between the end of 2006 and September 2007. *As per Shilling personal remark to the Plaintiff during the job interview there in 2007 Shilling stated he had decided not to consider the Plaintiff for employment after speaking with Hogsett about the Plaintiff's performance at Dartmouth College*. This is an intentional tort based on the conspiracy with the outlined damage: at the Plaintiff's market value of >$150k base annually for the time frame from 2003 to 2013 the Plaintiff has only *improper name use/bad reference-based damages from Dartmouth for $1.5M with no interest included*.

IV.   *Incorrect employment records, the Plaintiff's identity stolen and questionable ABT LLC/Inc. employment records:*

*The Plaintiff's Dartmouth HR record (2012) indicates his work at Dartmouth College from 01/02/2002 through 04/30/2006, as a part-time position since 08/15/2003 [Exhibit 11]. The other half of such part-time (ABT LLC/Inc. record) is not verifiable since the company is inactive [Exhibit 5]). Dartmouth HR record [Exhibit 11] contradicts to the job continuation letters through August 31, 2006 the Plaintiff does have from Dean Lotko 2004 and Dean Helble 2006 [Exhibit 26].* Thayer Scholl Dean Helble confirmed the dates in the "reference" the Plaintiff gathered from him in 2013 [Exhibit 27].

*In 2013 [Exhibit 29], Hogsett did not confirm the Plaintiff's starting date at ABT Inc. despite of his job offer 2006 letter [Exhibit 28].* In [Exhibit 29], H*ogsett specified that the Plaintiff was an average performer at the executive level* with problems communicating with peers but still called the Plaintiff the *Project Director* for ABT Inc. (!), *not only the PI/Senior Scientist as in 2006 job offer letter [Exhibit 28].* Such "loss of memory" did not prevent full time Dartmouth employees at that time Mielenz and Hogsett from *stealing the Plaintiff's identity and reporting the Plaintiff to the DOE financial office in 2003-2005 with no the Plaintiff's knowledge and consent as the Project Director* (federal fraud III) and *claimed the Plaintiff as the person who was responsible for filing financial reports (SF-425) on spending of the SBIR I & II funds of $849,691.00 in FY 2003-2005, according to the Emails the Plaintiff got from the DOR financial office in 2012* [Exhibits 30, 31]. The Plaintiff had to file the Police report with the Houston Forgery Division of HPD [Exhibit 32] about *his identity stolen by ABT LLC/Inc owners, full-time Dartmouth employees Mielenz and Hogsett, operating at the facilities of Dartmouth College with support of Dartmouth College officials at the time of the Plaintiff's employment at Dartmouth. Mielenz and Hogsett failed to file SF-425s for FY2003-2005 for DE-FG02-03ER83593, for whatever reason not reporting their spending of the DOE grant money in 2003-2005* [Exhibits 30, 31].

ABT existed in NH as ABT, LLC and ABT, Inc. since 12/08/2003 [Exhibits 4, 33]. ABT LLC/Inc. registered agent Scatari avoided clarifying the date of ABT LLC formation [Exhibit 34]. *Therefore, the Plaintiff cannot fill multiple gaps in his employment by ABT LLC/Inc. operated at Dartmouth College facilities and owned/managed by full-time Dartmouth Employees Lynd/Mielenz/Hogsett who in conspiracy with Dartmouth HR rendered the Plaintiff unverifiable gaps in his ABT LLC/Inc. employment for 2003-2006 [Exhibit 11].* Amazingly, full-time Dartmouth employment record of Mielenz and Hogsett was not affected by their simultaneous full-time ABT Presidency – national origin-based discrimination against the Plaintiff committed by Dartmouth College, which had resulted in damages the Plaintiff was not aware about until 2012. In February 2013, the Plaintiff hired two recruiting agencies

to obtain Lynd's opinion on the contribution the Plaintiff has done for Lynd and his projects. *For over forty consequent days, no one recruiter was able to reach Lynd or his assistant to make an appointment for a phone conversation with Lynd. Instead, Lynd managed that potential employers can easily access the Plaintiff's incorrect employment record with Dartmouth HR containing employment gaps [Exhibit 11] in contrary to the job offer letters from Dartmouth and ABT LLC/Inc the Plaintiff does have on hands. In addition to inaccurate Dartmouth HR record, Lynd with no the Plaintiff's consent and knowledge listed the Plaintiff as Mascoma Corporation employee in his 08/28/2006 presentation available at Google and at the University site [Exhibit 2].* Only recent cost of these employment gaps/inconsistencies comprised lost opportunity to be considered for two types of executive level jobs: open rank Professor at Pan American University in Edinburg (TX) in 2012 and three Director positions at the direct competitor of Mascoma Corporation in February 2013 (both HR managers may be subpoenaed – there are records on file). Therefore, this is not much to ask from Dartmouth College for these torts and nationality- and age-based discrimination against the Plaintiff at his current job market value of >$150k annual base in TX, for the time frame from 2003 to 2013, the Plaintiff does have only *HR record-based damages from Dartmouth for $1.5M with no interest included yet*.

4.   A statement of a particular relief sought

The Plaintiff is claiming multiple intentional torts comprising acts of discrimination based on his nationality and age, committed in conspiracy against the Plaintiff by Dartmouth College in the form of appropriation of the Plaintiff's personal and intellectual property, his name and identity, damage to his health, to his professional and social reputation and to the Plaintiff's well-being in addition to the damage to revenue stream for the Plaintiff's TX business *in damages, totaling $15,000,000.00 with no interest included*. The Plaintiff wants his life back like it was in 2001.

5.   Michael (Mikhail) Tyurin, M.D., Ph.D.

   P.O. Box 300819

   Houston, TX 77230

   2294168994                              Signature: _____